IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., | ) | |
| SAMSUNG ELECTRONICS AMERICA, | ) | |
| INC., SAMSUNG SEMICONDUCTOR, | ) | Case No. 2:26-cv-456 |
| INC., AVNET, INC., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | (Lead Case) |
| | ) | |

## COMPLAINT

1.      Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, brings this Complaint against Defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Semiconductor, Inc. ("SSI" and, collectively with SEC and SEA, "Samsung"), and Avnet, Inc. ("Avnet" and, together with Samsung, "Defendants") for Defendants' infringement of U.S. Patent No. 12,650,937 ("the '937 Patent"). In addition, Netlist seeks a declaration that it has not breached any contractual obligation to Samsung, including obligations to license the '937 Patent to Samsung and its affiliates on reasonable and non-discriminatory ("RAND") terms, or violated federal or state competition laws, including Section 2 of the Sherman Antitrust Act and California's Unfair Competition Law.

## I.      THE PARTIES

2.      Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Way, Suite 100, Irvine, CA 92617.

3.      On information and belief, SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi-Do, 443-742, Republic of Korea.  On information and belief, SEC is the worldwide parent corporation for SEA and SSI, and is responsible for the infringing activities identified in this Complaint.  On information and belief, SEC's Device Solutions division is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, SEC is also involved in the design, manufacture, and provision of products sold by SEA.

4.      On information and belief, SEA is a corporation organized and existing under the laws of the State of New York.  On information and belief, SEA, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  Defendant SEA maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  SEA may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  SEA is a wholly owned subsidiary of SEC.

5.      On information and belief, SSI is a corporation organized and existing under the laws of the State of California.  On information and belief, SSI, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, Defendant SSI maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  Defendant SSI may be served with process through its registered agent National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.  On information and belief, SSI is a wholly owned subsidiary of SEA.  *See Samsung Electronics Co.,*

*Ltd., v. Netlist, Inc.*, No. 1:25-cv-626 (D. Del.), Dkt. 5 (Samsung's corporate disclosure statement providing that "SSI is a wholly-owned subsidiary of SEA").

6.      On information and belief, Avnet is a corporation organized and existing under the laws of the State of New York.  On information and belief, Avnet is involved in the use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, Avnet has a regular and established place of business at 3101 E. President George Bush Highway, Suite 250, Richardson, TX 75082.  On information and belief, Avnet is registered with the Texas Secretary of State to do business in Texas.  On information and belief, Avnet can be served through its registered agent, The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas, 78701-3218.

7.      On information and belief, Defendants have used, sold, or offered to sell products and services, including the Accused Instrumentalities, in this judicial district.

## II.      JURISDICTION AND VENUE

8.      Subject matter jurisdiction is based on 28 U.S.C. § 1338, in that this action arises under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*), and the Declaratory Judgment Act (28 U.S.C. §§ 2201-2202), under the Sherman Antitrust Act (15 U.S.C. § 2).  This Court has subject matter jurisdiction over Netlist's claims alleged in this action at least under 28 U.S.C. §§ 1331, 1338, and 2201(a).  Additionally, supplemental jurisdiction pursuant to 28 U.S.C. § 1367 is appropriate here over the Second and Fifth Claims for declaratory relief based on the common nucleus of operating facts forming the same case or controversy as the declaratory judgment claims based on Section 2 of the Sherman Act, 15 U.S.C. § 2 in Claims Three and Four. Indeed, under Samsung's repeated view, supplemental jurisdiction under 28 U.S.C. § 1367 exists over its own breach of contract claim when paired with a declaratory judgment claim of non-infringement of the same patent.  *See Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:21-cv-1453

(D. Del.), D.I. 1, ¶ 8 ("The breach of contract claim forms part of the same case or controversy as the claims for declaratory judgment of non-infringement and unenforceability asserted by Samsung in this action."); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No 23-1122 (D. Del.), D.I. 1, ¶ 9 (same); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No 24-614 (D. Del.), D.I. 15, ¶ 9 (same); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 25-1371 (D. Del.), D.I. 1, ¶ 9 (same).  Thus, to the extent Samsung is correct, then this Court has supplemental jurisdiction over the breach of contract declaratory judgment claim.

9. Each Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

10. Personal jurisdiction exists generally over the Defendants because each Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Eastern District of Texas. Personal jurisdiction also exists over each Defendant because each, directly or through subsidiaries, makes, uses, sells, offers for sale, imports, ships, distributes, advertises, makes available, and/or markets products within the State of Texas and the Eastern District of Texas that infringe one or more claims of the '937 Patent.  Further, on information and belief, Defendants have placed or contributed to placing infringing products into the stream of commerce, both directly and through intermediaries (including distributors, retailers, authorized dealers, sales agents, and other individuals or entities), knowing or understanding that such products would be sold and used in the United States, including in this District.  Moreover, Samsung has admitted that its other similar breach of contract claims arise directly out of Netlist's "assertions of patents." *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:25-cv-1589 (D. Del.), D.I. 10-1, ¶ 19; *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:25-cv-1371 (D. Del.), D.I. 1, ¶ 2.  Samsung specifically points to Netlist's assertions in the Eastern District of Texas for its own breach of contract claims.  C.A. No.

1:25-cv-1589, ¶¶ 205, 212; C.A. No. 1:25-cv-1371 (D. Del.), D.I. 1, ¶ 118.  This District and Texas are thus intertwined with this dispute between Netlist and Samsung.  And Samsung purposefully availed itself of the protections of the laws of Texas and within this District by participating in those lawsuits underlying its breach of contract claims.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).  Generally, venue is also proper in this District under 28 U.S.C. § 1391(b)–(c) because Defendants are all subject to personal jurisdiction in this District.  In addition, under Section 1391(b)(3), Samsung has taken the position that there is no venue where "all necessary parties" can all be sued together for infringement, and that SSI, SEA, and Netlist are all indispensable. *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 25-626 (D. Del.), D.I. 15 at 1-2, 9-10.  Venue is also proper for Samsung because Samsung maintains a regular and established place of business in this District.  For instance, SEC maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.  As another example, SEA maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.  Venue is also proper for SSI because it maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.

12.     Samsung has attempted to contest venue in this District in a recent patent infringement case involving Samsung's DDR5 DIMM products, but despite refusing Netlist's attempts to engage in venue discovery, Samsung's motion disputing venue was rendered moot before that case was stayed.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:25-cv-00557, Dkts. 160, 166 (E.D. Tex. Mar. 2, 2026); *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:25-cv-00748, Dkts. 81, 92 (E.D. Tex. Mar. 2, 2026).  Prior to that, Samsung did not contest venue in

multiple actions between the parties in this District. *See Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-463 (E.D. Tex.) ("*Samsung I*" or "*EDTX I*"), *Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-293 (E.D. Tex.) ("*Samsung II*" or "*EDTX II*").  To any extent that SEA alleges it has no involvement with the Accused Instrumentalities and therefore has not committed acts of infringement within this Eastern District of Texas under Section 1400(b), a jury has already found that SEA infringed U.S. Patent Nos. 11,016,918 ("the '918 Patent") and 11,232,054 ("the '054 Patent") based on its DDR5 products.  On information and belief and to any extent SSI alleges that 6625 Excellence Way, Plano Texas 75023 is not its regular and established place of business under Section 1400(b), SSI (along with SEC) has ratified this location as a regular and established place of business and, in addition, SEC, SSI, and SEA have sufficiently disregarded corporate formalities or work so closely together to treat them as one for venue purposes.  For instance, Samsung has a unified website for SEC, SSI, and SEA, and uses common signage on the building at 6625 Excellence Way that does not differentiate between SEC, SSI, and SEA.  And on June 2, 2026, Samsung cemented its roots in this District, announcing that its Plano, Texas location will soon be the site of its U.S. headquarters: "[W]e are relocating our U.S. headquarters from New Jersey to our existing campus in Plano, Texas, building on our 30-year presence in the state. The transition, which will be completed by the end of the year, is intended to strengthen alignment across teams and offices, and sharpen our focus on the areas that will drive the greatest impact for our customers, partners and business."[1]  Moreover, on information and belief, Samsung has a close, contractual relationship with its distributor and agent, Avnet, located within this District at 3101 E. President George Bush Highway, Suite 250, Richardson, TX 75082, also with sufficient interim control and agency to support patent venue.

---

[1] Sasha Richie, *Samsung Moving U.S. Headquarters to Dallas*, The Dallas Morning News (June 2, 2026), https://www.dallasnews.com/business/technology/article/samsung-moving-u-s-headquarters-plano-22288252.php.

13.     Venue is also proper for Avnet because it maintains a regular and established place of business in this judicial district at 3101 E. President George Bush Highway, Suite 250, Richardson, TX 75082 and has committed acts of infringement in this judicial district. Specifically, Avnet offers for sale and distributes its products, including the Accused Instrumentalities supplied by Samsung, all throughout the United States, including the State of Texas and the Eastern District of Texas.  Avnet's website, https://www.avnet.com/americas/, has an (800) contact number that prospective customers can call to obtain more information or a quote for the Accused Instrumentalities (and other products).  Avnet's website also specifically targets customers in Texas, including those in the Eastern District of Texas, by providing region-specific email contact, including dallas@avnet.com.[2]

14.     Therefore, Samsung, together with Avnet as the distributor of the Accused Instrumentalities, have offered to sell, have sold, and have intentionally and voluntarily placed infringing products into the stream of commerce with the expectation and understanding that those products will be sold, purchased, and/or used by its customers in the State of Texas, including the Eastern District of Texas.

## III.     FACTUAL ALLEGATIONS

### A.     Background

15.     Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies.  Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets.  Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time.  These capabilities will become increasingly valuable

---

[2] *Locations: Avnet Americas*, Avnet (last visited June 5, 2026), https://www.avnet.com/americas/about-avnet/locations/.

as the volume of data being processed continues to exponentially increase.  Netlist has secured multiple jury verdicts confirming the commercial success of its inventions.  For example, in 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:21-cv-463, Dkt. 479.  As another example, in 2024, a jury in the Eastern District of Texas awarded Netlist $445 million in damages against Micron, another dominant memory module manufacturer.  *See Netlist, Inc. v. Micron Technology Texas, LLC*, No. 2:22-cv-294, Dkt. 135. And in November 2024, a jury in the Eastern District of Texas found that Samsung willfully infringed three other Netlist patents and awarded Netlist $118 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-293, Dkt. 847.

16.    Netlist has a long history of being the first to market with disruptive new products such as the first load-reduced dual in-line memory module ("LR-DIMM"), HyperCloud®, based on Netlist's distributed buffer architecture. This technology was later adopted by the industry for DDR4 LRDIMMs, the predominant high-end server memory module for the past several years. The same architecture and patented signal correction technology are also used in Accused DDR5 Products such as DDR5 RDIMMs.  Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM.  Netlist's pioneering NVDIMM products utilized the same on-module power management technology found on newer-generation DDR5 DIMMs.  These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via quad-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

17.    In many commercial products, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs).

The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system. A memory module is typically installed into a memory slot on a computer motherboard.

18. Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications. Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR5, DDR4, DDR3) and the type of module (*e.g.*, RDIMM, LRDIMM).

**B.      The '937 Patent**

19. The '937 Patent is entitled "Memory Module Providing Distinct Signaling Interfaces Via an Open-Drain Output for Distinct Operations," and was filed as U.S. Application No. 18/413,017 ("the '017 Application") on January 15, 2024 and assigned to Netlist, Inc. The '937 Patent issued on June 9, 2026, and claims priority to, among others, U.S. Application No. 17/840,593, filed June 14, 2022, now U.S. Patent No. 11,880,319 ("the '319 Patent"); U.S. Application No. 16/680,060, filed November 11, 2019, now U.S. Patent. No. 11,386,024 ("the '024 Patent"); U.S. Application No. 13/942,721, filed July 16, 2013, now U.S. Patent No. 9,311,116 ("the '116 Patent"); U.S. Application No. 12/815,339, filed June 14, 2010, now U.S. Patent No. 8,489,837 ("the '837 Patent"); and U.S. Provisional No. 61/186,799 filed June 12, 2009.

20. Claim 1 of the '937 Patent provides:

[1pre] A memory subsystem operable with a system memory controller of a host system, the host system including a memory bus coupled to the system memory controller, the memory bus including control/address (C/A) signal lines, data signal lines, and an error signal line, the memory subsystem comprising:

[1a] a printed circuit board configured to be coupled to the system memory controller via the memory bus;

[1b] dynamic random access memory elements on the printed circuit board and operable to communicate data signals with the system memory controller; and

**[1c]** a memory subsystem controller on the printed circuit board and operable to control the dynamic random access memory elements, the memory subsystem controller having an open drain output configured to be coupled to the error signal line, wherein the memory subsystem controller is further operable to provide a signaling interface to the system memory controller via the open drain output during normal memory read and write operations and a feedback path from the memory subsystem to the system memory controller via the open drain output for initialization operation sequences during an initialization operation;

**[1d]** wherein the memory subsystem controller is operable to output via the signaling interface a parity error signal in response to a parity error having occurred during any of the normal memory read and write operations;

**[1e]** wherein the memory subsystem controller is operable to output via the feedback path a first signal related to a first part of the initialization operation sequences and subsequently a second signal related to a second part of the initialization operation sequences, the first signal causing the open drain output to be at a low logic level for a first time period before returning to a high impedance state, the second signal causing the open drain output to be at the low logic level for a second time period before returning to the high impedance state, the second part of the initialization operation sequences being distinct from the first part of the initialization operation sequence, the second time period being distinct from the first time period and having a different duration from that of the first time period;

**[1f]** wherein, during each of the memory read and write operations, the memory subsystem is operable to output or receive data signals in response to respective C/A signals from the system memory controller, the C/A signals being transmitted via the C/A signal lines, the data signals being transmitted via the data signal lines; and

**[1g]** wherein, during the initialization operation, the memory subsystem is not operable to respond to any C/A signals from the system memory controller by outputting to, or receiving from, the data signal lines any data signals.

## C.    Defendants' Infringing Activities

21.    Samsung is a global technology company and one of the largest manufacturers of semiconductor memory products such as DRAM and NAND Flash used in DDR5 DIMM products. Samsung develops, manufactures, sells, offers to sell, and imports into the United States

memory components and memory modules designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.

22.    Samsung and Netlist were initially partners under a 2015 Joint Development and License Agreement ("JDLA"), which granted Samsung a 5-year paid-up license to Netlist's patents "having an effective first filing date on or prior to" November 12, 2020. *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 20-cv-993, Dkt. 186 at 20-21 (C.D. Cal. Oct. 14, 2021).  On information and belief, Samsung used Netlist's technologies to develop products both in the mature markets such as DDR4 memory modules and the emerging market for new generations of DRAM technologies, including DDR5 and HBMs.  Under the JDLA, Samsung was obligated to supply Netlist certain memory products at competitive prices.  Samsung, however, did not honor its promises and repeatedly failed to fulfill Netlist's product orders.  As a result, Netlist terminated the JDLA on July 15, 2020, which termination was found effective on summary judgment by a federal district court in the Central District of California on October 14, 2021.  *Id.*

23.    Samsung appealed this decision, and the Ninth Circuit partially reversed the summary judgment ruling.  Following remand, the contract action in C.D. Cal. proceeded to a jury trial.  On May 17, 2024, the jury returned a verdict finding that Netlist's interpretation of the JDLA's supply provision was correct, and Samsung's breach of that provision was material.  On December 26, 2024, the Court granted Samsung's motion for a new trial, and a new trial was held on March 18-21, 2025.  On March 24, 2025, the jury returned a verdict for Netlist.  As a result of this jury verdict, Samsung's license to Netlist's patents was terminated on July 15, 2020.

24.    In April 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages, including $147,225,000 for the '918 and '054 Patents—asserted against Samsung's DDR5 memory modules. And in November 2024, a jury found that Samsung willfully infringed three different Netlist

patents and awarded Netlist $118 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-293, Dkt. 847.

25.    Avnet "is one of the largest distributors of electronic components, computer products and embedded technology."[3]   As an authorized distributor of Samsung memory products,[4] Avnet "accelerates its partners' success by connecting the world's leading technology suppliers with a broad base of customers by providing cost-effective, value-added services and solutions."[5]  Avnet is involved in the use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.

### D.    DDR5 Memory Modules

26.    The Accused DDR5 Products include, without limitation, any Samsung DDR5 products made, sold, offered for sale, used and/or imported into the United States by Defendants. By way of non-limiting example, the accused DDR5 memory modules include Samsung's DDR5 RDIMMs.  As further example, the Accused Instrumentalities include, without limitation, any DDR5 products made, sold, offered for sale, used and/or imported into the United States by Defendants comprising a module board, a registered clock driver (RCD), and a plurality of dynamic random-access memory (DRAM) devices, such as Samsung's Product Part No. M321R8GA0BB0-CQK sold on Amazon.com, featuring a 64GB DDR5 4800MHz Dual Rank 1.1V Registered DIMM with PC5-38400 ECC RDIMM 2Rx4 (EC8 10x4) and 288-Pin for Server RAM Memory.  *See, e.g.*, https://www.amazon.com/Samsung-4800MHz-PC5-38400-Registered-M321R8GA0BB0-CQK/dp/B0CFG7THWM/:

---

[3] *Avnet, Inc. Names Rodney C. Adkins to Its Board of Directors*, SEC (June 15, 2015), https://www.sec.gov/Archives/edgar/data/8858/000129993315000942/exhibit1.htm.

[4] *Samsung*, Avnet (last visited June 5, 2026), https://www.avnet.com/americas/manufacturers/m/samsung/.

[5] *Avnet, Inc. Names Rodney C. Adkins to Its Board of Directors*, *supra*.



*See also DDR*, Samsung (last visited June 5, 2026),

https://semiconductor.samsung.com/dram/ddr/ (Registered DIMM, or "RDIMM"):



*Id.*:



**RDIMM**

**Registered DIMM**

Samsung RDIMM uses a register to buffer command and control signals, improving signal integrity and system stability for server platforms. With ECC support and x4/x8 organizations across single- and multi-rank options, RDIMM provides dependable performance for enterprise workloads.

27.    As shown above, each of the DDR5 memory modules includes a plurality of edge connections through which command/address signals are received from a memory controller of

the host computer system and data is exchanged with the memory controller.  Samsung's DDR5 RDIMMs also include a memory subsystem controller, called a Registered Clock Driver ("RCD").

28.    DDR5 memory modules introduced important upgrades over DDR4 modules to support massive bandwidth requirements and AI workloads, as well as to benefit from the reduced power consumption and enhanced reliability that DDR5 memory offers over its predecessors.

### E.    Compliance with Contract and Competition Law

29.    Samsung has a history of filing retaliatory litigation against Netlist alleging that Netlist's patents are standard essential ("SEPs") under JEDEC, and that Netlist has allegedly failed to license these patents on reasonable and non-discriminatory ("RAND") terms. Based on these allegations, Samsung has brought suit against Netlist for breach of contract, violations of Section 2 of the Sherman Antitrust Act, and violation of California's Unfair Competition Law ("UCL").

30.    On September 30, 2025, Netlist brought a complaint under Section 337 of the Tariff Act of 1930 against Samsung in the United States International Trade Commission ("USITC") alleging infringement of various Netlist patents.  *Certain Dynamic Random Access Memory (DRAM) Devices, Products Containing the Same, and Components Thereof,* Inv. No. 337-TA-1472 ("USITC Compl.").  Netlist's complaint expressly alleged that the asserted patents were not standard essential.  USITC Compl. ¶ 20 ("Netlist is not relying on essentiality to the standard to establish infringement by the proposed Respondents. In particular, the JEDEC standard does not require all limitations of any one of the Asserted Claims. Accordingly, none of the Asserted Claims is standard-essential.").

31.    Despite this, Samsung filed counterclaims, which it subsequently removed to the United States District Court for District of Delaware pursuant 19 U.S.C. § 1337(c) and 19 C.F.R. § 210,149(e), alleging the following: "Although Netlist asserts alleged SEPs in [the USITC] action, Netlist has not made a RAND offer, in violation of its RAND commitment to all JEDEC

members. Through this and other conduct described in more detail below, Netlist has violated and/or attempted to violate Section 2 of the Sherman Act, breached its contractual obligations owed to Samsung, and engaged in unfair competition in violation of California Business and Professions Code § 17200 *et seq.*" *Samsung Electronics Co., LTD., v. Netlist, Inc.*, 1:25-cv-01589-UNA (D. Del., Dec. 31, 2025), Dkt. 1-1 ¶¶ 11-12.

32.    Samsung has unsuccessfully made similar arguments alleging the same facts previously before this Court.

33.    For example, Samsung asserted defenses of laches, estoppel, and/or waiver, and inequitable conduct, in Case Nos. 2:21-cv-00463 ("*EDTX I*") and 2:22-cv-00293 ("*EDTX II*") for Netlist's alleged noncompliance with RAND obligations and with JEDEC's disclosure obligations, and for Netlist's alleged failure to disclose JEDEC prior art in patent prosecution. *See* Answer to First Am. Compl. at 39, 44–51, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. May 18, 2022), Dkt. No. 25; Answer to Third Am. Compl. at 22–23, 28–44, *EDTX II*, No. 2:22-cv-00293 (E.D. Tex. Sept. 11, 2023), Dkt. No. 145.

34.    The JEDEC Patent Policy obligates licensing only "Essential Patent Claims" on RAND terms.  JEDEC defines "Essential Patent Claims" as claims that "would necessarily be infringed by" complying with "a final approved JEDEC standard."  In other words, only patent claims that are actually essential to a JEDEC standard must be licensed on RAND terms.

35.    Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential. *EDTX I*, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id.*, at 147:1-6 ("[The Court]: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial,

Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *EDTX I*, Dkt. 550, at 25. Compliance with JEDEC standards is immaterial to Samsung's infringement of Netlist's patents.

36.     Samsung has repeatedly claimed that the parents of the patent-in-suit are not standard essential. Samsung has repeatedly claimed that it does not infringe Netlist's parent patents through Samsung's design, manufacture, use, importation, offering for sale, and/or sales of certain semiconductor products including the Accused Instrumentalities and related products, which are JEDEC standard compliant, meaning there is no RAND obligation if the parent patents are not infringed. On information and belief, Samsung also claims it does not infringe the patent-in-suit.

37.     Netlist has complied with all RAND obligations regardless of whether its patent is essential.

38.     Even if Samsung had a right to a RAND license to Netlist's patents, those rights were eliminated by Samsung's bad faith, including its material breach of the JDLA and its willful infringement of Netlist's patents.

39.     Samsung has been found in material breach of the JDLA, thus eliminating any right Samsung would have had to a RAND license, if one existed. *See* Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 20-cv-993 (C.D. Cal. May 17, 2024), Dkt. No. 556.

40.     Samsung is an adjudicated willful infringer of a number of Netlist's patents. *See* Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-463 (E.D. Tex. Apr. 21, 2023), Dkt. No. 479.

41.     Therefore, Samsung lost any right to have a RAND license to Netlist's patents, if a right ever existed.

42. On information and belief, because Samsung maintains the patent-in-suit is not essential to any JEDEC standard, Netlist had no obligation to disclose either patent to JEDEC or its members.  *Cf.* Order on Pretrial Motions, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. Apr. 5, 2023), Dkt. No. 432 (granting Netlist's motion in limine to "[p]reclude Samsung from presenting any allegations that Netlist has failed to comply with JEDEC obligations").

43. The Court has rejected Samsung's equitable defenses arising from these same facts. *See* Memorandum Opinion and Order, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. Aug. 11, 2023), Dkt. No. 550; *cf.* Final Judgment, *EDTX II*, No. 2:22-cv-00293 (E.D. Tex. Dec. 2, 2024), Dkt. No. 855.

44. Any coercive claims relating to the above are compulsory and must be brought by Samsung in this action.

## IV.   FIRST CLAIM FOR RELIEF – '937 Patent

45. Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

46. On information and belief, Defendants directly infringed and are currently infringing at least one of the claims of the '937 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused DDR5 Products, and other products with materially the same structure in relevant part.  For example, and as shown below, the Accused DDR5 Products and other products with materially the same structure and operating mechanisms in relevant part infringe at least Claim 1 of the '937 Patent.

47. The allegations below are based upon Netlist's current information and belief. Internal documentation from Defendants, including confidential Samsung product specifications

and source code, will show infringement. The examples provided below are not intended to be, and should not be understood as, limiting in any way.

48. According to Samsung's public representations, "Samsung manufactures products that abide by JEDEC standards and consistently aims for the best efficiency in the industry[.]"[6] Therefore, on information and belief, the Accused DDR5 Products comply with JEDEC Standards for Double Data Rate 5 (DDR5) Registered Dual In-line Memory Modules (DDR5 RDIMM), JESD305A, Version 2.00 (Revision of JESD305 Version 1.00, January 2022) for "DDR5 Registered Dual Inline Memory Module (RDIMM) Common Standard," February 2025, and JESD82-514.01 (Editorial Revision of JESD82-514, May 2024) for "DDR5 Registering Clock Driver Definition (DDR5RCD04)," June 2024.

49. To the extent the preamble is limiting, the Accused DDR5 Products are each a memory subsystem that is operable to communicate with a memory controller of a computer system via a memory bus including control/address (C/A) signal lines, data signal lines and an error signal line. For example, Samsung explains on its website that the Accused DDR5 RDIMMs (*i.e.*, registered dual in-line memory modules) are memory modules. *See, e.g.*, *DDR*, Samsung (last visited June 5, 2026), https://semiconductor.samsung.com/dram/ddr/ (RDIMM "is a type of server ***memory module***") (emphasis added):

### What is RDIMM?

RDIMM (Registered DIMM) is a type of server memory module that includes a register between the memory controller and the DRAM chips.

This register buffers or "stabilizes" the command and address signals before they reach the DRAM chips, reducing electrical load on the memory controller. Because of this architecture, RDIMMs provide greater reliability and support higher memory capacities compared to unbuffered modules, making them widely used in enterprise servers and data-center systems. RDIMMs are designed specifically for server environments and are not compatible with standard desktop or laptop systems.

---

[6] *Optimized DDR5 DIMM Solutions: Powering Leading-Edge Server Memory Modules*, Samsung (Apr. 9, 2025), https://semiconductor.samsung.com/news-events/tech-blog/optimized-ddr5-dimm-solutions-powering-leading-edge-server-memory-modules/.

50.      Further, each memory module comprises a printed circuit board, a memory subsystem controller, and dynamic random access memory elements.  For example, Samsung shows its DDR5 RDIMMs as having a module board (i.e., printed circuit board), a registered clock driver (RCD) (i.e., memory subsystem controller), and a plurality of dynamic random access memory (DRAM) devices (i.e., dynamic random access memory elements).  *See, e.g.*, *DDR5*, Samsung (last visited June 5, 2026), https://semiconductor.samsung.com/dram/ddr/ddr5/:



51.      Additionally, Samsung describes its memory modules as integrating DRAM chips onto a circuit board and serving as the main memory in computer systems.  *See DDR*, Samsung (last visited June 5, 2026), https://semiconductor.samsung.com/dram/ddr/:

### What is a DRAM module?

A DRAM module is a memory component that integrates multiple DRAM chips onto a small circuit board and serves as the main memory in computers and electronic devices. These modules are manufactured in standardized formats so they can be easily installed and recognized by different systems. Common examples include UDIMM for desktop PCs, SO-DIMM for laptops and compact systems, and RDIMM or LRDIMM for servers and data-center platforms.

The DRAM module temporarily stores the data required by processors such as the CPU or GPU, enabling smooth program execution, efficient multitasking, and stable data processing. In essence, it is an essential component that directly influences the overall performance and responsiveness of modern computing systems.

*See also id.*:

**What is the difference between UDIMM, RDIMM, LRDIMM, and SODIMM?**

UDIMM, RDIMM, LRDIMM, and SODIMM are different types of DRAM modules
designed for specific system environments.

UDIMM (Unbuffered DIMM) is commonly used in desktop PCs and some workstations.
It has no register or buffer, which results in lower latency,
but it supports smaller memory capacities compared to server-grade modules.

RDIMM (Registered DIMM) includes a register that buffers commands
and addresses between the memory controller and the DRAM chips.
This improves signal stability and allows systems to use higher memory capacities,
making it suitable for enterprise servers and data-center platforms.

LRDIMM (Load-Reduced DIMM) uses additional buffering to further reduce the electrical load on the memory controller.
This enables servers to support very large memory capacities and improves scalability for memory-intensive workloads.

SODIMM (Small Outline DIMM) is a compact form factor used in laptops, mini PCs, and small-form-factor systems.
It functions similarly to UDIMM but is physically smaller to fit in space-constrained devices.

52.    On information and belief, the memory module (memory subsystem) is operable such that it can communicate with the memory controller of a host computer system when inserted into a memory slot on the motherboard.  *See DDR5*, Samsung (last visited June 5, 2026), https://semiconductor.samsung.com/dram/ddr/ddr5/ ("[T]he system will not operate properly unless the CPU also supports DDR5," which is determined by "the memory controller inside the CPU."):

**How can I check if my motherboard supports DDR5?**

To check whether your motherboard supports DDR5, first look up your motherboard model
and review the official specification page on the manufacturer's website.
The memory section will clearly indicate which types of RAM—such as DDR5 or DDR4—are supported.

It is also important to check your CPU, because the memory controller inside the CPU
determines which DDR generation it can use. Even if the motherboard has DDR5 slots,
the system will not operate properly unless the CPU also supports DDR5.

53.    On information and belief, the module board is configured to be coupled to the system memory controller via the memory bus.  For example, Samsung explains that the Accused DDR5 Products communicate with the CPU through the memory bus: "To meet the demands of next-generation CPUs, DDR5 brings much higher data rates, lower power consumption, and

increased density[,]" thereby "improving command/address and data bus efficiency."[7]  By way of further example, Samsung explains that its modules have specific physical designs, including notch positions and pin layouts, that require precise alignment for proper electrical and signaling connection and support.  *See, e.g.*, *DDR5*, Samsung (last visited June 5, 2026), https://semiconductor.samsung.com/dram/ddr/ddr5/:

### Can I use DDR5 RAM on a DDR4 motherboard?

No, you cannot use DDR5 RAM on a DDR4 motherboard.

DDR5 and DDR4 use different physical slot designs, electrical requirements, and signaling methods. Because the notch positions and pin layouts are not the same, a DDR5 module cannot fit into a DDR4 slot, and the memory controller on a DDR4 motherboard does not support DDR5.

To use DDR5 RAM, you must have a motherboard and CPU that are specifically designed for DDR5.

*See also id.*:

### Does it matter which way a DDR5 module is facing?

Yes, it does.
DDR5 modules can only be inserted in one direction because the notch on the connector must match the key in the motherboard slot.

If it is facing the wrong way, it will not align with the slot and should never be forced in, as this can damage both the module and the motherboard.

Match the notch to the slot key and press down until the latches click into place.

54.　　On information and belief, the Accused DDR5 Products comply with the JEDEC Standard No. 305A "Pin Definitions" table below, which lists the pins of the DDR5 RDIMM module board and their definitions, showing the module board has edge connections for coupling to control/address (C/A) signal lines (CA[6:0]_A, CA[6:0]_B, CS[1:0]_A, CS[1:0]_B), data signal lines (DQ[31:0]_A, DQ[31:0]_B), and an error signal line (ALERT_n) of the data bus. *See* JESD305A at 3, Table 3:

---

[7] *DDR5: Breaking the Bandwidth Barrier*, Samsung (Jan. 30, 2020), https://semiconductor.samsung.com/news-events/tech-blog/ddr5-breaking-the-bandwidth-barrier/.

**Table 3 — Pin Definitions**

| Pin Name | Description | Pin Name | Description |
|---|---|---|---|
| CA[6:0]_A<br>CA[6:0]_B | Command and Address (CA) Bus | DQ[31:0]_A<br>DQ[31:0]_B | DIMM memory Data bus channel A and B |
| CS[1:0]_A_n<br>CS[1:0]_B_n | Control (Chip Select) (CS_n) | CB[7:0]_A<br>CB[7:0]_B | DIMM ECC Checkbits (CB) channel A and B |
| PAR_A<br>PAR_B | Parity input | DQS[5:0]_A_t<br>DQS[5:0]_B_t | Data Strobes (positive line of differential pair) |
| CK_t | Clock (true/positive) | DQS[5:0]_A_c<br>DQS[5:0]_B_c | Data Strobes (negative line of differential pair) |
| CK_c | Clock (complement/negative) | TDQS[5:5]_A_t<br>TDQS[5:5]_B_t | Not valid for x4 operation. Enabled via Mode Register. |
| ALERT_n | Alert for CRC error | TDQS[5:5]_A_c<br>TDQS[5:5]_B_c | Not valid for x4 operation. Enabled via Mode Register. |
| RESET_n | Set SDRAM to known state | Vin_Bulk | DIMM Power Supply from system to PMIC |
| PCAMP | Control and Monitor Port | Vin_Mgmt | DIMM Power Supply from system to PMIC |
| HSCL | I2C/I3C-Basic Host Sideband Bus Clock | VSS | Power supply return (ground) |
| HSDA | I2C/I3C-Basic Host Sideband Bus Data | RFU | Reserved for future use |
| HSA | I2C/I3C-Basic Host Sideband Bus Address | | |
| LBDQ | Loopback Data output | | |
| LBDQS | Loopback Data strobe output | | |

NOTE 1   TDQSx and DQSx_t share a pin.

55.      Further, on information and belief, the DRAM devices on the module board are operable to communicate data signals with the system memory controller.  For example, as illustrated in the figure below, the dynamic random access memory elements (SDRAM) on the module board communicate data signals (DQ) with the system memory controller via the board's edge connector pins.  *See* JESD305A, Fig. 8, at pg. 20:



Figure 8 — Data and Strobe Diagram Example

56.     Further, on information and belief, the Accused DDR5 Products include an RCD (memory subsystem controller), which controls the DRAM elements.  As illustrated below, on information and belief, RCDs are connected to each of the DRAM elements, and configured to receive system C/A signals (Pre-RCD signals) and output module C/A signals (QCA, QCS) for controlling those dynamic random access memory elements (e.g., SDRAM), which are configurable to communicate data signals (DQ) with the system memory controller (JESD305A, Fig. 2, at pg. 13):



57.     Additionally, as illustrated in the below JEDEC logic diagram, the RCD outputs C/A signals (QACA[13:0]_A, QBCA[13:0]_A, QACS[1:0]_A_n, QBCS[1:0]_A_n, QACA[13:0]_B, QBCA[13:0]_B, QACS[1:0]_B_n, QBCS[1:0]_B_n,) to control the memory devices in response to C/A signals (DCA[6:0]_A, DCS[1:0]_A_n, DCA[6:0]_B, DCS[1:0]_B_n) received from the system memory bus.  *See* JESD82-514.01, at 7:



58.    On information and belief, the memory subsystem controller has an open drain output configured to be coupled to the error signal line, allowing the memory subsystem controller to provide a signaling interface to the system memory controller during normal memory read and write operations and a feedback path from the memory subsystem to the system memory controller for initialization operation sequences during an initialization operation.  For example, the Accused DDR5 RDIMMs have error correction functionality which implies they have an error signal line. *See DDR*, Samsung (last visited June 5, 2026), https://semiconductor.samsung.com/dram/ddr/:

**What is ECC memory, and do I need it?**

ECC (Error-Correcting Code) memory is a type of DRAM module that can detect and correct single-bit errors during data processing. These errors can occur naturally from electrical interference, cosmic rays, or signal noise, and although small, they can lead to data corruption or system instability.

ECC memory is mainly used in servers, workstations, and mission-critical systems where data accuracy, uptime, and reliability are essential. Most consumer desktops and laptops do not require ECC memory, and many do not support it.

However, if you operate workloads involving scientific computing, financial systems, medical applications, AI training, or enterprise-grade servers, ECC memory may be necessary to ensure system stability and data integrity.

*Id.* ("All RDIMMs designed for server use already include ECC (Error-Correcting Code) functionality by default. … [A]n RDIMM for servers is an ECC-enabled registered module by definition."):

### What is the difference between RDIMM and ECC RDIMM?

RDIMM and ECC RDIMM are closely related, but not exactly the same.

All RDIMMs designed for server use already include ECC (Error-Correcting Code) functionality by default. The term RDIMM generally refers to server-grade registered modules that inherently support ECC, even when "ECC" is not explicitly stated in the name.

When the term ECC RDIMM is used, it is simply emphasizing that the RDIMM includes ECC error-correcting capabilities. Functionally, there is no difference—an RDIMM for servers is an ECC-enabled registered module by definition.

In short, RDIMM and ECC RDIMM operate the same way, and the naming difference only reflects whether the ECC feature is explicitly highlighted.

59.      Further, on information and belief, the Accused DDR5 Products have circuit wiring as shown in the JEDEC diagram below, which shows the open drain output (ALERT_n) coupled to the error signal line (ERROR_IN_n).  JESD305, at 31.



**6.9.3   ALERT_n Circuit Wiring**

ALERT_n will be wired as a long fly-by connection with the RCD at one end. Connection will be from the ALERT_n pin of the RCD to the SDRAM ALERT_n pin of each in a daisychain manner for each channel. There will be a pull-up resistor to VDDQ at the end farthest SDRAM electrically from the register for each Channel. There will be a filter capacitor near the RCD pin for each channel. This circuit should be simulated to verify clean signal edges. Figure 12 demonstrates one possible wiring for this circuit.

The ALERT_n output of the RCD is connected to the ALERT_n pin of the edge pin connector.

Terminate with 47 Ω at end of daisychain of each Channel.

Place 10pF near RCD of each Channel

**Figure 13 — Example Wiring of the ALERT_n Function - RDIMM and LRDIMM**

60.      Further, as shown in the table below (listing the terminals of the RCD and their definitions), the RCD has an open-drain output (ALERT_n), and the RCD is configured to provide a signaling interface via the open drain output during normal memory read and write operations to indicate a parity error.  JESD82-514.01, at 4 (Table 2):

Table 2 — Terminal Functions

| Signal Group | Signal Name | Type | Description |
|---|---|---|---|
| Input Control bus | DCS[1:0]_[B:A]_n | POD V<sub>REF</sub> based | Chip Select inputs to the RCD. Two inputs per DRAM channel. |
| Input Address and Command bus | DCA[6:0]_[B:A] | POD V<sub>REF</sub> based | Command/Address bus inputs to the RCD. Separate sets per channel. |
| Parity input | DPAR_[B:A] | POD V<sub>REF</sub> based | Command Address input parity is received on the DPAR pin and should maintain even parity across the CA inputs. DPAR is sampled at the rising and falling edges of the input clock. |
| Clock inputs | DCK_t/DCK_c | POD differential | Differential system clock input pair to the PLL. The clock is common to both RCD channels, CH_A and CH_B. |
| Loopback | DLBD_[B:A]<br>DLBS_[B:A] | POD V<sub>REF</sub> based | Loopback Inputs to RCD<br>DLBD - loopback Data<br>DLBS - loopback Strobe |
| Reset input | DRST_n | CMOS input | Active LOW asynchronous reset input. When LOW, it causes a reset of the internal latches and disables the outputs, thereby forcing the outputs to float. |
| Error input | DERROR_IN_[B:A]_n | Low voltage swing POD input | DRAM CRC ALERT_n output is connected to this input pin, which in turn is buffered and redriven to the ALERT_n output of the register. There is a separate signal per channel |
| Output Control bus | Q[B:A]CS[1:0]_[B:A]_n | POD | Chip Select signals to the DRAMs. 2 copies of each signal. |
| Output Address and Command bus | Q[B:A]CA[13:0]_[B:A] | POD | Command/Address bus outputs to the DRAMs, valid after the specified clock count and immediately following a rising edge of the clock. Two copies of each signal. When Output Inversion is enabled in RW00[5], Copy B output signals get inverted during all commands other than Deselect. Both copies drive High during idle cycles (i.e., deselect). |
| Clock outputs | Q[D:A]CK_[B:A]_t<br>Q[D:A]CK_[B:A]_c | POD differential | Clock outputs to the DRAMs. Four copies per channel. |
| Loopback | QLBD<br>QLBS | POD | Loopback outputs to Host<br>QLBD - loopback Data<br>QLBS - loopback Strobe |
| Reset output | QRST_[B:A]_n | POD | Re-driven or CMD based reset. This is an asynchronous output. It is the responsibility of the RCD QRST_n to reset the DDR5 SDRAM on all DIMM topologies. The QRST_n outputs are asserted at power up. RCD requires MRW to independently de-assert to allow staggering of sub-channels. |
| Error out | ALERT_n | POD | When LOW, this output indicates that a parity error was identified associated with the CA inputs when parity checking is enabled or that the DERROR_IN_n input was asserted, regardless of whether parity checking is enabled or not. One signal for the two channels |

61.    By way of further example, JESD82-514.01 describes how in training mode, the RCD is further configured to provide a feedback path to the system memory controller via the open drain output for initialization operation sequences (DCS_n signal) during an initialization operation.  *See* JESD82-514.01, at 51:

### 5.1.1  DCS Training Mode (DCSTM) - Host Interface

The DCS Training Mode is a method to facilitate the loopback of a sampled sequence of the DCS_n signal. In this mode, the DCK is running, and the DCA and DPAR signals are ignored by the RCD. Once this mode is enabled, the RCD is selected to actively sample and drive feedback. The RCD will sample the DCS_n signal on the rising edge of DCK. Every set of four DCK rising edge samples will be included in a logical computation to determine the DCSTM Output result that is sent back to the host on ALERT_n or QLBx configured in RW01[5]. Once sampling begins, the RCD must maintain the consecutive grouping of the samples every 4 tCK. When the DCS_n Sample[0] and Sample[2] results in a logic 0 and the DCS_n Sample[1] and Sample[3] results in a logic 1, the RCD will drive a 0 on ALERT_n or QLBx. The output signal can transition as often as every 4 tCK. All commands to DRAM are blocked by the RCD when DCS Training mode is enabled. The host shall not enable Power Down mode in RW00 until after all Host Interface Training is complete.

62.    On information and belief, the memory subsystem controller is operable to output via the signaling interface a parity error signal in response to a parity error having occurred during any of the normal memory read and write operations.  For example, as explained in JESD82-514.01, "[a]fter the RCD receives DPAR_N from the memory controller, it compares it with the DATA received on the CA inputs and indicates on its open-drain ALERT_n pin (active LOW) whether a parity error has occurred."  *Id.* at 22 (section 3.5.3).  This is consistent with how

Samsung describes the Accused DDR5 Products' error correction operation on its website. *See DDR5: Breaking the Bandwidth Barrier*, Samsung (Jan. 30, 2020), https://semiconductor.samsung.com/news-events/tech-blog/ddr5-breaking-the-bandwidth-barrier/:

**Scalability for Next-Gen Computing**

Optimized DRAM core timings and On-die error correction code are the two main factors improving scalability for DDR5. While memory architectures continue to scale year over year, it comes at a cost including drops in DRAM cell capacitance and increasing contact resistance in bit lines. DDR5 addresses these drawbacks and allows for more reliable scaling with optimized core timings that are critical to ensure adequate time to write, store and sense charges in the DRAM cell.

On-die error correction code (ECC) improves data integrity and reduces the system error correction burden by performing correction during READ commands prior to outputting the data. DDR5 also introduces an error check scrub where the DRAM will read internal data and write back corrected data if an error occurs.

*See also* JESD82-514.01, at 123 (Table 89) (listing various control words including the control word for controlling the Alert_n assertion in the event of a parity error):

Table 89 — RW01 - Parity, CMD Blocking, and Alert Global Control Word

| OP 7 | OP 6 | OP 5 | OP 4 | OP 3 | OP 2 | OP 1 | OP 0 | Definition | Encoding |
|---|---|---|---|---|---|---|---|---|---|
| x | x | x | x | x | x | x | 0 | Parity Checking | Parity checking disabled[1] |
| x | x | x | x | x | x | x | 1 | | Parity checking enabled |
| x | x | x | x | x | x | 0 | x | DRAM Interface Forward All CMDS | Block |
| x | x | x | x | x | x | 1 | x | | Do not block |
| x | x | x | x | x | 0 | x | x | Reserved | Reserved |
| x | x | x | x | x | 1 | x | x | | Reserved |
| x | x | x | x | 0 | x | x | x | Reserved | Reserved |
| x | x | x | x | 1 | x | x | x | | Reserved |
| x | x | x | 0 | x | x | x | x | Reserved | Reserved |
| x | x | x | 1 | x | x | x | x | | Reserved |
| x | x | 0 | x | x | x | x | x | Host Interface Training Feedback[2] | Both Sub channels feedback on ALERT_n |
| x | x | 1 | x | x | x | x | x | | Sub CH_A feedback on QLBD; Sub CH_B feedback on QLBS |
| x | 0 | x | x | x | x | x | x | ALERT_n Assertion[3,4] | Static ALERT_n Assertion Mode[5] |
| x | 1 | x | x | x | x | x | x | | Pulsed ALERT_n Assertion Mode[6] |
| 0 | x | x | x | x | x | x | x | ALERT_n Re-enable[7] | Parity checking remains disabled after ALERT_n pulse |
| 1 | x | x | x | x | x | x | x | | Parity checking is re-enabled after ALERT_n pulse |

NOTE 1  Register does not check for parity including control word programming.
NOTE 2  Includes DCS, DCA, and DFE Training Mode
NOTE 3  This bit only affects ALERT_n assertion that is a result of a CA parity error. In case of a LOW level on the DERROR_IN_n input, ALERT_n stays asserted as long as DERROR_IN_n remains LOW unless DRST_n is LOW or the device is in clock stopped power down mode.
NOTE 4  For details on ALERT_n output driver strength levels, see Table 233, "Output Driver DC Electrical Characteristics, Entire Operating Temperature Range".
NOTE 5  ALERT_n stays asserted until "Clear CA Parity Error" command is sent.
NOTE 6  ALERT_n pulse width according to Table
NOTE 7  CA Parity Error Status bit in Error Log Register remains set until cleared by sending a Clear CA Parity Error command.

63.     On information and belief, the memory subsystem controller is operable to output via the feedback path a first signal related to a first part of the initialization operation sequences, causing the open drain output to be at a low logic level for a first time period before returning to a

high impedance state, and the memory subsystem controller is further operable to subsequently output via the feedback path a second signal related to a second part of the initialization operation sequences, with the second signal causing the open drain output to be at the low logic level for a second time period before returning to the high impedance state.  For example, as shown in the timing diagram for an initialization operation, the memory subsystem controller (RCD) outputs via the feedback path (Alert_n) a first signal related to a first part of the initialization operation sequences (DCS_n) . . . the first signal causing the open drain output to be at a low logic level for a first time period (combination of 2 consecutive tDCSTM_ALERT_Windows), *see* JESD82-514.01, FIG. 42:



Figure 42 — Timing Diagram for DCS Training Mode with Consecutive Output Samples = 0

64.    On information and belief, these first and second parts of the initialization operation sequences in the Accused DDR5 Products are distinct and have distinct time periods and durations. For example, in the following timing diagram for an initialization operation, the memory subsystem controller (RCD) outputs via the feedback path (Alert_n) a second signal related to a second part of the initialization operation sequences (DCA[6:0]) . . . the second signal causing the open drain output to be at a low logic level for a second time period (tDCATM_ALERT_Window), which is distinct and has a duration different from that of the first time period (one or two consecutive tDCSTM_ALERT_Windows), *see* JESD82-514.01, FIG. 45:



Figure 45 — Timing Diagram for DCA Training Mode SMBus Exit

65.      As shown above (*e.g.*, JESD305A, Fig. 8, at pg. 20; JESD305A, Fig. 2, at pg. 13; JESD82-514.01, at 7), during each of the memory read and write operations, the memory subsystem of the Accused DDR5 Products can output or receive data signals in response to respective C/A signals from the system memory controller, with the C/A signals being transmitted via the C/A signal lines and the data signals being transmitted via the data signal lines.

66.      By contrast, and also on information and belief, during the initialization operation, the memory subsystem of the Accused DDR5 Products cannot respond to any C/A signals from the system memory controller by outputting to, or receiving from, the data signal lines any data signals.   For example, the following description of the CS training modes states that "[a]ll commands to DRAM are blocked by the RCD when DCS Training mode is enabled," meaning that during the DCS training operation, the memory subsystem is not configured to respond to any C/A signals from the system memory controller by outputting to, or receiving from, the data signal lines any data signals.   JESD82-514.01, at 51:

### 5.1  CS Training Modes

#### 5.1.1  DCS Training Mode (DCSTM) - Host Interface

The DCS Training Mode is a method to facilitate the loopback of a sampled sequence of the DCS_n signal. In this mode, the DCK is running, and the DCA and DPAR signals are ignored by the RCD. Once this mode is enabled, the RCD is selected to actively sample and drive feedback. The RCD will sample the DCS_n signal on the rising edge of DCK. Every set of four DCK rising edge samples will be included in a logical computation to determine the DCSTM Output result that is sent back to the host on ALERT_n or QLBx configured in RW01[5]. Once sampling begins, the RCD must maintain the consecutive grouping of the samples every 4 tCK. When the DCS_n Sample[0] and Sample[2] results in a logic 0 and the DCS_n Sample[1] and Sample[3] results in a logic 1, the RCD will drive a 0 on ALERT_n or QLBx. The output signal can transition as often as every 4 tCK. All commands to DRAM are blocked by the RCD when DCS Training mode is enabled. The host shall not enable Power Down mode in RW00 until after all Host Interface Training is complete.

*See also id.* at 54 (Section 5.2) (describing the DCA training modes, stating that "[w]hen the RCD is in this mode, no functional commands are executed" and that "[t]he function command interface is restored only after exiting this mode."):

### 5.2 CA Training Modes

#### 5.2.1 DCA Training Mode (DCATM) Interface

The DCA Training Mode is a method to facilitate the loopback of a logical combination of the sampled DCA[6:0] and DPAR signals. This mode can only be entered after DCS training has been performed. In DCATM, the DCK is running, and the DCS0_n qualifies when the DCK samples the DCA signals. A loopback equation that includes all the DCA and DPAR signals results in an output value that is sent asynchronously on the ALERT_n or QLBx signal back to the host memory controller. The host timings between DCS_n, DCK, DCA[6:0] and DPAR signals can then be optimized for proper alignment. DCK must stay valid with constant phase and frequency. When the RCD is in this mode, no functional commands are executed. The functional command interface is restored only after exiting this mode. All commands to DRAM are blocked by the RCD during DCA Training mode. The host must ensure Parity Checking is disabled in RCD prior to and during DCA training. Power Down mode must be disabled in RCD prior and during DCA Training.

67.    Further, as in the DCS training mode, all commands to DRAM are blocked by the RCD during DCA training mode, meaning that during the DCA training operation, the memory subsystem is not configured to respond to any C/A signals from the system memory controller by outputting to, or receiving from, the data signal lines any data signals:

#### 5.2.1.1   Entry and Exit for DCA Training Mode

The DCA Training Mode is enabled through an SMBus write or an in-band write with Enhanced RWUPD feature to RW02[3:0]. The signal used to provide the feedback is configured by RW01[5]. RCD can be configured to use ALERT_n (which requires training each sub-channel independently and one after the other), or use both QLBD and QLBS (which allows training both sub-channels in parallel). For the remainder of this section, we assume ALERT_n was selected for feedback. Once this SMBus or in-band command has executed, no other commands will be interpreted by the RCD in the sub-channel that enters DCA Training Mode. The sub-channel that is not in Training Mode will interpret commands as in normal mode of operation. The host is responsible for avoiding undesirable signal events or commands on the RCD sub-channel that is not in Training Mode. That includes avoiding commands that may interfere with the resources needed to support DCA Training Mode such as, for example, MRW to enable the Parity Checking. For the sub-channel that is in Training Mode, only the sampling of the DCA signals, evaluation of the XOR result, and loop back to the ALERT_n will occur. While in DCA Training Mode, the DCS0_n signal will only assert for a single tCK at a time.

68.    On information and belief, Defendants also indirectly infringe the '937 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as customers and end users, in the Eastern District of Texas and elsewhere in the United States.  For example, on information and belief, Defendants have induced, and currently induce, the infringement of the '937 Patent through their affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the Accused DDR5 Products and other materially similar products that infringe the '937 Patent.  On information and belief, Defendants provide specifications, datasheets,

instruction manuals, and/or other materials that encourage and facilitate infringing use of the Accused DDR5 Products and other materially similar products by users in a manner that Defendants know or should have known would result in infringement and with the intent of inducing infringement.  On information and belief, Defendants are encouraging and facilitating infringement of the '937 Patent by others.  For example, on information and belief, Defendants sell or otherwise provide the Accused DDR5 Products to distributors or U.S.-based sales entities knowing that these entities intend to make, use, offer to sell, and/or sell the products within the United States and/or import the products into the United States in an infringing manner.

69.    On information and belief, Defendants also indirectly infringe the '937 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in the Eastern District of Texas and elsewhere in the United States.  For example, on information and belief, Defendants have contributed to, and currently contribute to, Defendants' customers' and end-users' infringement of the '937 Patent through their affirmative acts of selling and offering to sell, either directly or through distributors, in this District and elsewhere in the United States, the Accused DDR5 Products and other materially similar products that infringe the '937 Patent.  On information and belief, the Accused DDR5 Products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, Defendants are aware that the product or process that includes the Accused DDR5 Products and other materially similar products may be covered by one or more claims of the '937 Patent.  On information and belief, the use of the product or process that includes the Accused DDR5 Products and other materially similar products infringes at least one claim of the '937 Patent.

70.    Samsung's infringement of the '937 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '937 Patent and its infringement since at

least the filing of this Complaint but as early as the '937 Patent issuing.  Samsung's infringement of the '937 Patent has been continuing and willful.   Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement.  On information and belief, Samsung was previously aware of the '937 Patent even before its issue date.  Indeed, ***Samsung previously admitted it was actively monitoring the '017 Application prior to its issuance as the '937 Patent***.  *See, e.g.*, *Samsung Elecs. Co., Ltd. v. Netlist, Inc.*, C.A. No. 23-1122 (D. Del. July 11, 2025), Dkt. No. 30 at 5 & n.2 ("Samsung intends to file . . . a claim for declaratory judgment of non-infringement of any patent that issues from [Netlist's] '017 application in this Court").

71.    Avnet's infringement of the '937 Patent has damaged and will continue to damage Netlist.  Avnet has had actual notice of the '937 Patent since at least the filing of this Complaint. Avnet's infringement of the '937 Patent is willful.   Avnet continues to commit acts of infringement, including advertising, marketing, offering to sell and/or selling the Accused Instrumentalities, despite a high likelihood that its actions constitute infringement, and Avnet knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## V.    SECURE SECOND CLAIM FOR RELIEF – Declaratory Judgment of No Breach of RAND Obligations

72.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

73.    Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has breached its commitment under JEDEC.

74.    Any allegation that Netlist has breached any RAND obligation under JEDEC's Patent Policy for the '937 Patent is barred by the statute of limitations.

75.   Netlist cannot have breached its RAND obligations given that (1) Netlist granted Samsung a license in the form of the JDLA, (2) Samsung has never argued this license was not RAND compliant, and (3) the reason why this license is no longer in effect is because of Samsung's own material breach as determined by the Central District of California.  Netlist discharged its RAND obligation by offering a patent license to Samsung that Samsung, not Netlist, chose to breach.

76.   Netlist has also not breached any RAND obligation under JEDEC's Patent Policy, which only applies to "Essential Patent Claims."  JEDEC Manual No. 21T § 8.2.4 (". . . each Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's Essential Patent Claims . . ."); *id.* at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard").

77.   The Court has recognized Netlist's patents as not standard essential.  *Netlist, Inc. v. Samsung Elecs. Co.,* No. 2:21-cv-463 (E.D. Tex.), Dkt. 427 (PTC Tr.) at 146:15-22 (The Court: "[N]one of the asserted patents are standard essential, they are not encumbered with a RAND obligation"), 147:1-6 (The Court: "[T]here are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:22-cv-293 (E.D. Tex.); Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that [U.S. Patent Nos. 7,619,912, 11,093,417, and 10,268,608] … are not standard essential patents….").  As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard.  *Netlist, Inc. v. Samsung*

*Elecs. Co.*, No. 2:21-cv-463 (E.D. Tex.), Dkt. 550, at 25.  Similarly, the '937 Patent is not essential to any JEDEC standard.

78.    Netlist has negotiated and offered a license in compliance with RAND.

79.    Samsung is not a willing licensee; rather Samsung has acted in bad faith, including materially breaching the JDLA, and willfully infringing Netlist's patents, thus eliminating any right Samsung would have had to a RAND license, if one existed.

80.    Because RAND obligations do not apply to the '937 Patent, Netlist is not in breach of any RAND obligations.

81.    To the extent RAND obligations do exist, Netlist has complied with all RAND obligations.

82.    Any such claim is barred by the statute of limitations.

83.    Accordingly, Netlist is entitled to a declaration that it has not breached any RAND obligations.

84.    Samsung cannot satisfy any of the elements for such a claim.

## VI.    THIRD CLAIM FOR RELIEF – Declaratory Judgment of No Unlawful Scheme to Acquire and Exploit Monopoly Power in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

85.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

86.    Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has engaged in an unlawful scheme to acquire and exploit monopoly power in violation of Section 2 of the Sherman Act.

87.    Netlist denies that any anti-trust markets exist for anti-trust purposes as it relates to Netlist's actions ("Relevant Markets").

88.     To the extent any Relevant Markets exist, Netlist has no market power in any Relevant Markets.  Netlist and Samsung have repeatedly asserted that Netlist patents are not essential to any JEDEC Standard.  Indeed, Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential.  *EDTX I*, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id*., at 147:1-6 ("[The Court: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential ….").  As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard.  *EDTX I*, Dkt. 550, at 25.  Nor are the claims of the '937 Patent essential to any JEDEC standard.  Thus, Netlist could not have excluded competition much less held power to charge supra-competitive prices.  As a result, Netlist has not acquired or maintained any monopoly power as a result of Netlist's involvement in JEDEC.

89.     Netlist met any JEDEC disclosure duty that existed and did not fail to disclose its patents as essential or potentially essential to JEDEC committees.  There is no obligation to disclose a patent that is not standard essential.  *See* JEDEC Manual No. 21T § 8.2.4 (". . . each Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's Essential Patent Claims . . ."); *id*. at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard").  This is further confirmed by testimony of Samsung's JEDEC representative (and corporate representative in deposition on JEDEC), who testified that JEDEC does not obligate companies to disclose essential patents.

90.     Netlist did not deceive JEDEC or the industry by withdrawing or later rejoining JEDEC committees.

91.     Netlist has no leverage over manufacturers of standard-compliant products.

92.     Because a patent claim must be supported by the specification, Netlist did not use its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry.  The USPTO issued Netlist patents because the concepts it created were novel, non-obvious and properly disclosed.  Netlist has not acquired any monopoly power by improperly obtaining patents for technologies that Netlist did not invent.

93.     Netlist's lawful activities have not caused customers in any alleged Relevant Markets, such as Samsung, or customers in the downstream market to face higher costs for access to DDR5 or related technologies.  Rather, Samsung chose to breach the JDLA and willfully infringe Netlist's patents.

94.     Any such claim is barred by the statute of limitations.

95.     Samsung has no anti-trust standing and has not suffered anti-trust injury.

96.     Accordingly, Netlist is entitled to a declaration that it has not violated the anti-trust laws.

97.     Samsung cannot satisfy any of the elements for such a claim.

## VII.    <u>**FOURTH CLAIM FOR RELIEF – Declaratory Judgment of No Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**</u>

98.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

99.     Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy

between Netlist and Samsung as to whether Netlist has engaged in attempted monopolization in violation of Section 2 of the Sherman Act.

100.    Netlist denies that any Relevant Markets exist for anti-trust purposes.

101.    To the extent any Relevant Markets exist, Netlist has not attempted to acquire or exploit market power in any Relevant Markets related to JEDEC-compliant DIMMs.  Netlist and Samsung have repeatedly asserted that Netlist patents are not essential to any JEDEC Standard. Indeed, Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential. *EDTX I*, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id.*, at 147:1-6 ("[The Court: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."),  As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard.  *EDTX I*, Dkt. 550, at 25.  Nor are the claims of the '937 Patent essential to any JEDEC standard.  Thus, Netlist could not have created a probability of excluding competition much less held power to charge supra-competitive prices.  As a result, Netlist has not attempted to acquire or maintain any monopoly power as a result of Netlist's involvement in JEDEC.

102.    Netlist's conduct at JEDEC has not created any probability of achieving monopoly power.  Netlist met any JEDEC disclosure duty that existed and did not fail to disclose its patents as essential or potentially essential to JEDEC committees.  There is no obligation to disclose a patent that is not standard essential.  *See* JEDEC Manual No. 21T § 8.2.4 (". . . each Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's Essential Patent Claims . . ."); *id*. at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use

of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard").  This is further confirmed by testimony of Samsung's JEDEC representative (and corporate representative in deposition on JEDEC), who testified that JEDEC does not obligate companies to disclose essential patents.  Thus, Netlist has not attempted to acquire monopoly power through improper, exploitative means.

103.   Netlist has not attempted to exploit any market power by using its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry because patent claims are limited by the specification.  The USPTO issued Netlist patents because the concepts it created were novel, not  obvious, and properly disclosed. Netlist has not acquired any monopoly power by improperly obtaining patents for technologies that Netlist did not invent.

104.   Netlist's lawful activities have not caused customers in any alleged Relevant Markets, such as Samsung, or customers in the downstream market to face a dangerous probability of a distorted market, such as higher costs for access to DIMM technologies.  Rather, Samsung chose to breach the JDLA and willfully infringe Netlist's patents.

105.   Samsung has no anti-trust standing and has not suffered anti-trust injury.

106.   Any such claim is barred by the statute of limitations.

107.   Accordingly, Netlist is entitled to a declaration that it has not attempted to monopolize the market for technologies covered by any JEDEC standard.

108.   Samsung cannot satisfy any of the elements for such a claim.

## VIII.   FIFTH CLAIM FOR RELIEF – Declaratory Judgment of No Unfair Competition Under Cal. Bus. & Prof. Code § 17200

109.   Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

110.   Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has violated California's UCL.

111.   Netlist has not engaged in any unfair competition under Cal. Bus. & Prof. Code § 17200, including (a) any unlawful business acts or practices in violation of Section 2 of the Sherman Act, (b) any unfair conduct by failing to disclose patents to JEDEC Committees or satisfying its RAND obligations, (c) obtaining its patents through improper derivation—claiming as its own the work of other JEDEC members, (d) knowingly asserting invalid patents in litigation against Samsung, or (e) seeking injunctive relief against Samsung for Samsung's infringement of Netlist's Patents.

112.   Any such claim is barred by the statute of limitations.

113.   Accordingly, Netlist is entitled to a declaration that it is not in violation of California Business & Professions Code § 17200.

114.   Samsung cannot satisfy any of the elements for such a claim.

## IX.   DEMAND FOR JURY TRIAL

115.   Pursuant to Federal Rule of Civil Procedure 38(b), Netlist hereby demands a trial by jury on all issues triable to a jury.

## X.   PRAYER FOR RELIEF

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A.   that Defendants infringe the '937 Patent;

B.    all equitable relief the Court deems just and proper as a result of Defendants' infringement;

C.    an award of damages resulting from Defendants' acts of infringement in accordance with 35 U.S.C. § 284;

D.    that Samsung's infringement of the '937 Patent is willful;

E.    that Avnet's infringement of the '937 Patent is willful;

F.    a declaration that Netlist is not liable for breach of contract under JEDEC Patent Policy by demanding unreasonable and discriminatory royalties for a license to standard-essential patents;

G.    a declaration that Netlist has not violated Section 2 of the Sherman Act, 15 U.S.C. § 2 by engaging in an unlawful scheme to acquire or exploit monopoly power;

H.    a declaration that Netlist's '937 Patent is not unenforceable because Netlist has not engaged in a scheme to acquire or exploit monopoly power through enforcement of the patent;

I.    a declaration that Netlist has not violated Section 2 of the Sherman Act, 15 U.S.C. § 2 by engaging in attempted monopolization;

J.    a declaration that Netlist has not violated California Business and Professions § 17200 based on fraudulent, unlawful, and/or unfair conduct;

K.    enhanced damages pursuant to 35 U.S.C. § 284;

L.    that this is an exceptional case and awarding Netlist its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

M.    an accounting for acts of infringement and supplemental damages, without limitation, prejudgment and post-judgment interest;

N.    in the alternative to an award of damages under 35 U.S.C. § 284, an order pursuant to 35 U.S.C. § 283 permanently enjoining Defendants, their distributors, officers, agents, servants, employees, attorneys, instrumentalities and those persons in privity, active concert or participation with them, from further acts of direct and/or indirect infringement of the '937 Patent, including the manufacture, sale, offer for sale, importation and/or use of the infringing products; and

O.    such other equitable relief which may be requested and to which Netlist is entitled.

Dated: June 8, 2026    Respectfully submitted,

*/s/ Jennifer Truelove*

Jason G. Sheasby
jsheasby@irell.com
H. Annita Zhong
azhong@irell.com
Andrew J. Strabone
astrabone@irell.com
Blair A. Silver
bsilver@irell.com
Andrew H. Henderson
dhenderson@irell.com
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

***Attorneys for Plaintiff Netlist, Inc.***